## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on May 11, 2006**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.: 06-259** |
| | : | |
| | : | **Grand Jury Original** |
| | : | |
| | : | **VIOLATIONS:** |
| **v.** | : | |
| | : | **18 U.S.C. § 371** |
| | : | **(Conspiracy);** |
| | : | **18 U.S.C. §§ 78j(b) and 78ff** |
| | : | **(Securities Fraud);** |
| **MARC DUCHESNE,** | : | **18 U.S.C. § 1505** |
| **a.k.a. Carl von Wasserman** | : | **(Obstruction of Justice);** |
| **a.k.a. Otto von Rittner** | : | **18 U.S.C. § 1001** |
| **a.k.a. Marc Spinks** | : | **(False Statements);** |
| | : | **18 U.S.C. § 2** |
| **Defendant** | : | **(Aiding and Abetting, Causing an Act** |
| | : | **to be Done)** |

### SUPERSEDING INDICTMENT

The Grand Jury charges:

### COUNT ONE
(Conspiracy to Commit
Securities Fraud and Wire Fraud)

### Relevant Persons and Entities

At times material to this Indictment:

1.    MARC DUCHESNE, the defendant, was a citizen of the United Kingdom and resided

in Houston, Texas.

2.    Nationwide Capital Corporation ("Nationwide") was a Nevada corporation with

offices in Houston, Texas which had de minimis assets and revenues and virtually no business

operations.  In July 2002, Nationwide merged with Calwest Ventures Inc. ("Calwest"), a publicly traded "shell" company which also had no significant assets, income or business.   The merger of Nationwide and Calwest occurred after MARC DUCHESNE and others had purchased virtually all of the outstanding shares of Calwest.  At the conclusion of the merger, the surviving entity was Nationwide Capital Corporation.

3.    After the merger, Nationwide became a publicly traded company under the symbol "NCCN."  Nationwide had common stock registered with the United States Securities and Exchange Commission ("SEC") under the Securities Act of 1933, and from on or about August 16, 2002, through on or about October 1, 2002, the common stock of Nationwide traded on the electronic bulletin board system (the "OTC Bulletin Board") maintained by the National Association of Securities Dealers (the "NASD").  Nationwide was required by law to file with the SEC truthful statements regarding its business affairs, including periodic reports on its financial condition and operations.  On October 1, 2002, the SEC suspended trading in Nationwide securities until October 15, 2002, citing questions about statements made by Nationwide concerning its business operations, business relationships, financial condition and its acquisition of another company.

4.    Suisse Alliance Corporation ("Suisse Alliance") was a Nevada corporation controlled by DUCHESNE with an office in Houston, Texas.

5.    Anglo-American Fund LLC ("Anglo-American Fund") was a Nevada corporation controlled by DUCHESNE which listed the same mailing address as a Florida business which provided office space.

2

6.    Morgan West Financial Services PLC ("Morgan West") maintained a brokerage account at Morgan Stanley.  DUCHESNE identified himself as a director of Morgan West and had trading authority over its brokerage account at Morgan Stanley.

7.    Jeffrey Hayden, a resident of Chattanooga, Tennessee, was the controlling principal of Nine Trees Corporation, a Nevada corporation, and was a co-schemer of defendant DUCHESNE. Hayden helped to broker the acquisition of Calwest by DUCHESNE and others at Nationwide.

8.    Gregory Moffitt, a resident of Houston, Texas, was the President and Chief Executive Officer of Nationwide and was a co-schemer of defendant DUCHESNE.

9.    C.P., a resident of Springfield, Virginia, was a relative of Gregory Moffitt.

10.    J.P., a resident of Houston, Texas, was a relative of Gregory Moffitt.

11.    Jonathan Moreland, a resident of Houston, Texas, was the President of the "Financial Services Division" of Nationwide and was a co-schemer of defendant DUCHESNE.

12.    Robert Parsley, a resident of Houston, Texas, was a commercial real estate broker and was a co-schemer of defendant DUCHESNE.  In or about June 2002, Parsley began to assist Jonathan Moreland, DUCHESNE and others associated with Nationwide with finding commercial office space for Nationwide.

13.    Foreign entity #1 was a money management business located in the Dominican Republic.

14.    Foreign entity #2 was a corporation registered in Nevis whose business was taken over by foreign entity #1.  Although foreign entity #2 was no longer active, foreign entity #1 kept its registration up-to-date in Nevis.

15.    Law firm #1 was a Colorado professional corporation owned by Colorado attorney D.B., who previously served as an escrow agent for DUCHESNE on certain business deals.

16.    Time Capital Corporation was an offshore corporation that was created by Moffitt, Moreland and others and controlled by Gregory Moffitt.

17.    Premier International Holdings, Inc. was an offshore corporation that was created and controlled by Jonathan Moreland.

18.    Your Corner Office ("YCO") was a Houston based consulting firm.

19.    The SEC was an agency of the United States located at 450 5th Street, N.W., Washington, D.C. and was responsible for protecting investors and maintaining the integrity of the securities markets.  As such, the SEC had regulatory and civil enforcement authority over companies such as Nationwide, whose securities were traded on the OTC Bulletin Board, as well as the officers, directors, and employees of such companies, such as Gregory Moffitt and Jonathan Moreland.

## THE CONSPIRACY

20.    From in or about May 2002, through in or about October 2002, in the District of Columbia and elsewhere, defendant MARC DUCHESNE, together with others known and unknown to the Grand Jury, unlawfully, willfully, and knowingly did conspire, confederate, and agree together with each other to commit offenses against the United States, to wit, to commit:

(1) Securities Fraud, that is, defendant MARC DUCHESNE, together with others known and unknown to the Grand Jury, unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly, would and did use and employ manipulative and deceptive devices and contrivances in violation of 17 C.F.R. § 240.10b-5, by (a) employing devices, schemes, and artifices to defraud, (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and (c) engaging in acts, practices, and

4

courses of business which operated and would operate as a fraud and deceit upon a person in connection with the purchase and sale of securities, all in violation of 15 U.S.C. §§ 78j(b) and 78ff; and

(2) Wire Fraud, that is, defendant MARC DUCHESNE, together with others known and unknown to the Grand Jury, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit, a scheme and artifice, among other things, to defraud, would and did transmit and cause to be transmitted by means of wire communications in interstate commerce, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of 18 U.S.C. § 1343.

## GOAL OF THE CONSPIRACY

21.     It was a goal of the conspiracy for defendant MARC DUCHESNE and co-schemers Jeffrey Hayden, Gregory Moffitt, Jonathan Moreland and Robert Parsley and others known and unknown to the Grand Jury:  (1) to unlawfully enrich themselves by engaging in a scheme to control and fraudulently manipulate the price of Nationwide common stock to artificially high levels in order to facilitate the sale of Nationwide shares owned by DUCHESNE, Hayden, Moffitt, Moreland, Parsley and various nominees with profits determined in whole or in part by the manipulation; and (2) to conceal these criminal activities from the SEC, the securities markets, and the actual and prospective investors in Nationwide common stock.

## MANNER AND MEANS OF THE CONSPIRACY

To further the objects and goals of the conspiracy, defendant MARC DUCHESNE and others known and unknown to the Grand Jury would and did use the following manner and means, among others:

22.     On various dates between May 2002 and October 2002, defendant MARC DUCHESNE and other conspirators and co-schemers:

a.    gained control of a publicly traded shell company by secretly purchasing all of the outstanding common stock of the shell company and changing the name of the company to Nationwide;

b.    caused Nationwide to be publicly traded on the OTC Bulletin Board under the trading symbol "NCCN;"

c.    secretly gained control of virtually all of the free-trading shares of Nationwide common stock by: (1) utilizing nominee companies, offshore companies and other means; and (2) causing free-trading Nationwide stock to be issued in the names of certain entities without the knowledge or consent of the principals of those entities;

d.    caused Nationwide common stock to be issued in the names of certain off-shore companies that were created and controlled by co-schemers Gregory Moffitt and Jonathan Moreland in order to disguise and conceal their interest in the stock from the SEC, the securities markets, and the actual and prospective investors in Nationwide;

e.    fraudulently restricted the public supply of Nationwide stock in order to prevent outsiders from obtaining Nationwide shares and thus enabled DUCHESNE and others to manipulate Nationwide common stock and drive its stock price to artificially high levels without risk that outsiders would sell the stock and deflate the price;

f.    used a fraudulent "matched order," that is a securities purchase or sale entered with the knowledge that a reciprocal order of substantially the same amount would be entered at substantially the same time for substantially the same price, to set the initial market price at which Nationwide stock was traded;

g.    manipulated the price of Nationwide stock by arranging for the execution of trades at prearranged prices and quantities between DUCHESNE, Hayden, Parsley, C.P. and others that were designed to create a false and misleading appearance of an active and rising market in Nationwide stock;

h.    manipulated the price of Nationwide stock by arranging for a late-day purchase of Nationwide stock at an inflated price in order to raise the reported closing price of the stock (also known as "marking the close");

i.    caused orders to be placed in a brokerage account for the purchase of Nationwide shares at inflated prices, and thereafter failed to cover the cost of these purchases, thereby: (a) causing the market to reflect an inflated price for Nationwide stock based upon fraudulent transactions that did not proceed to settlement; and (b) creating the false appearance of active trading in the stock;

j.       caused Nationwide's website to publish and disseminate materially false and misleading information about Nationwide's business operations;

k.      caused the dissemination of materially false and misleading information about Nationwide's business operations in a Power Point presentation that was attached to Nationwide's website and was distributed to prospective investors;

l.       submitted and caused to be submitted periodic reports to the SEC which contained materially false and misleading information about Nationwide's business operations and its shareholders;

m.     caused Nationwide to issue by wire a press release concerning its purported acquisition of YCO that contained false information about YCO's projected gross margins and earnings;

n.      in order to conceal the conspiracy and criminal conduct from the SEC, the securities markets and investors, caused Nationwide to file periodic reports with the SEC that falsely disclosed the percentage of ownership and control of Nationwide stock by DUCHESNE and others including co-schemers Moffitt and Moreland;

o.      caused a Form 13D Report to be filed with the SEC which falsely represented that DUCHESNE only owned 8.38 percent of the outstanding shares of Nationwide common stock.

## OVERT ACTS

Within the District of Columbia and elsewhere, in furtherance of the above described conspiracy and in order to carry out the objects thereof, DUCHESNE and others known and unknown to the Grand Jury committed the following overt acts, among others:

### Secret Control Over Nationwide's Free-Trading Shares

23.     On or about July 23, 2002, DUCHESNE and others purchased the outstanding common stock of Calwest.

24.     On or about August 6, 2002, DUCHESNE and others changed Calwest's name to Nationwide.

25.     On or before August 16, 2002, DUCHESNE caused free-trading Nationwide common stock to be registered in the names of Suisse Alliance and Anglo-American Fund.

26.     On or before August 16, 2002, DUCHESNE caused free-trading Nationwide common stock to be registered in the names of foreign entity #1 and law firm #1.

27.     On or about August 16, 2002, DUCHESNE and others caused Nationwide common stock to became publicly traded on the OTC Bulletin Board under the ticker symbol "NCCN."

## Matched Orders and Prearranged Trades

28.     On or about August 16, 2002, DUCHESNE and Jeffrey Hayden discussed by telephone a plan to have Hayden post an offer to sell 500 Nationwide shares at $9.35 per share, each well knowing said price in no way reflected the value of Nationwide common shares.

29.     On or about August 16, 2002, Hayden telephoned his broker and caused the broker to post a bid to sell 500 Nationwide shares at $9.35 per share.

30.     On or about August 16, 2002, DUCHESNE posted a matching bid to purchase 500 Nationwide shares at a price of $9.35 per share.

31.     On or about August 27, 2002, DUCHESNE asked Hayden over the telephone to buy 5,000 Nationwide shares at the price that DUCHESNE was offering those shares on the OTC Bulletin Board.

32.     On or about August 27, 2002, Hayden telephoned his broker and caused him to buy 4,500 Nationwide shares at prices ranging from $9.05 to $9.25.

33.    On or about August 27, 2002, DUCHESNE coordinated prearranged market trades between Hayden and others in which Hayden sold 6,900 Nationwide shares at prices ranging from about $4.75 to $9.

34.    On or about August 27, 2002, DUCHESNE and Gregory Moffitt instructed C.P. over the telephone to buy Nationwide common stock in an amount and at a price dictated by DUCHESNE.

35.    On or about August 27, 2002, C.P. telephoned his broker and caused him to purchase 3,000 Nationwide shares at $9 per share.

36.    On or about August 27, 2002, DUCHESNE telephoned Moreland's father, O.M., and instructed O.M. to buy Nationwide common stock in an amount and at a price dictated by DUCHESNE.

37.    On or about August 27, 2002, O.M. telephoned his broker and caused him to purchase 2,000 Nationwide shares at $9.20 per share.

38.    On or about August 29, 2002, DUCHESNE instructed Robert Parsley over the telephone to purchase Nationwide common stock in amounts and at prices dictated by DUCHESNE.

39.    On or about August 29, 2002, Robert Parsley telephoned his broker and caused him to buy a total of 800 shares of Nationwide common stock at prices ranging between $10.25 and $18.75 per share.

40.    In or about August 2002, DUCHESNE telephoned J.P. and asked J.P. to post a bid to buy Nationwide common stock at a price of $8 or $9 per share.

41.    In or about August 2002, DUCHESNE telephoned M.M., a securities broker, and asked if M.M.'s brokerage firm would "walk up the bid" on Nationwide common stock by posting an initial bid and then incrementally raising the bid price.

### Marking the Close

42.    On or about August 27, 2002, DUCHESNE instructed Jeffrey Hayden by telephone to buy Nationwide stock at an inflated price near the end of the trading day.

43.    On or about August 27, 2002, at or about 3:54 p.m., Hayden telephoned his broker and caused him to purchase 100 Nationwide shares at $9.25 per share.

### Other Fraudulent Purchases

44.    On or about September 27, 2002, DUCHESNE telephoned a broker at Morgan Stanley and caused the broker to purchase thousands of Nationwide shares for Morgan West at prices ranging from about $2.90 to $4.25 per share well knowing that he would not pay for these stock purchases.

45.    On or about September 30, 2002, DUCHESNE falsely assured the Morgan Stanley broker during a telephone conversation that he would pay for the Nationwide shares he had caused the broker to purchase for Morgan West on September 27, 2002.

### Nationwide's Website and Power Point Presentation

46.    In or about July 2002, DUCHESNE and others including Gregory Moffitt created a Nationwide website that contained materially false information about Nationwide's purported business operations and resources and caused the false information on the website to be disseminated to prospective investors via the internet and interstate wires.

10

47.    In or about August 2002, DUCHESNE and others including Gregory Moffitt created and caused to be disseminated through Nationwide's website a Power Point presentation that contained materially false information about Nationwide's purported business operations and resources.

48.    In or about August 2002, DUCHESNE and others gave the false Power Point presentation to prospective investors in Nationwide.

### False Filings with the SEC

49.    On or about August 7, 2002, DUCHESNE and others including Gregory Moffitt prepared and caused to be filed with the SEC in the District of Columbia a form 8-K that contained materially false information about Nationwide's purported business operations and shareholders.

50.    On or about August 19, 2002, DUCHESNE and others including Gregory Moffitt prepared and caused to be filed with the SEC in the District of Columbia a quarterly report on form 10-QSB for the quarter ending June 30, 2002, that contained materially false information about Nationwide's shareholders.

### False Press Release

51.    On or about September 27, 2002, Nationwide prepared and caused to be issued by wire to the District of Columbia and elsewhere a press release announcing the acquisition of YCO by a Nationwide subsidiary which contained materially false information about YCO's projected gross margins and earnings.

**(Conspiracy and Aiding and Abetting, Causing an Act to be Done,
in violation of Title 18, United States Code, Sections 371 and 2).**

## COUNT TWO
(Securities Fraud)

52.    The allegations contained in paragraphs 1 through 19 and 23 through 51 of this Indictment are repeated and re-alleged as if fully set forth herein.

53.    The allegations contained in paragraph 22 of this Indictment are repeated and re-alleged as if fully set forth herein as describing the manipulative and deceptive devices and contrivances and manner and means of the scheme to defraud used and employed by defendant MARC DUCHESNE and others in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5.

54.    From in or about May 2002 through in or about October 2002, in the District of Columbia and elsewhere, defendant MARC DUCHESNE unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and a course of business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of Nationwide common stock.

**(Securities Fraud and Aiding and Abetting, Causing an Act to be Done,
in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of
Federal Regulations, Section 240.10b-5; Title 18 United States Code, Section 2).**

## COUNT THREE
(Conspiracy to Obstruct Justice)

## INTRODUCTION

55.     The allegations contained in paragraphs 1 through 19 of this Indictment are repeated and re-alleged as if fully set forth herein.

56.     The SEC is responsible for enforcing the federal securities laws, including the Securities Exchange Act of 1934, 15 U.S.C. § 78, *et seq.*

57.     Beginning in or about 2002, the SEC commenced a proceeding and directed its staff to investigate whether Nationwide and others, directly or indirectly, in connection with the offer, purchase or sale of securities: (i) may have employed, or was employing, devices, schemes, or artifices to defraud; (ii) may have made, or was making, untrue statements of material facts; or may have omitted, or was omitting, to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and may have obtained, or be obtaining, money or property by means of such statements or omissions; or (iii) may have engaged in, or was engaging in acts, transactions, practices, or courses of business which had operated or would operate as a fraud or deceit upon purchasers or other persons through, among other things, company press releases, statements on Nationwide's web site, and other public statements concerning, among other things: (a) the company's business operations, (b) the company's business relationships, (c) the company's financial condition, (d) the company's acquisition of YCO, a privately held company, and (e) trading in the company's common stock by related shareholders.

58.     As its investigation progressed, it was material to the SEC to determine, among other things: (1) whether DUCHESNE and others including C.P. and Jeffrey Hayden had attempted to

13

artificially increase the price of Nationwide common stock by prearranging trades of Nationwide stock by and between DUCHESNE, C.P., Hayden and others: (2) whether Nationwide's press release concerning the acquisition of YCO contained false information; and (3) what percentages of Nationwide common stock were owned or controlled by DUCHESNE, Moffitt, Moreland and others.

## THE CONSPIRACY

59.     From in or about May 2002, through in or about October 2002, in the District of Columbia and elsewhere, MARC DUCHESNE, together with others known and unknown to the Grand Jury, unlawfully, willfully, and knowingly did conspire, confederate, and agree together with each other to commit offenses against the United States, to wit, Obstruction of Justice, that is, to corruptly influence, obstruct, and impede, and to endeavor to influence, obstruct, and impede, the due and proper administration of the Securities Exchange Act of 1934, 15 U.S.C. § 78, *et seq.*, and other statutes, rules, and regulations, under which a pending proceeding, *i.e.*, *In re Nationwide Capital Corp.* (File No. HO-9553), was being had before the SEC, an agency of the United States, by lying and causing others to lie to the SEC during investigative interviews and by attempting to conceal false information in a Nationwide press release, in violation of 18 U.S.C. § 1505.

## GOAL OF THE CONSPIRACY

60.     It was a goal of the conspiracy for defendant MARC DUCHESNE and others known and unknown to the Grand Jury including Jeffrey Hayden, Gregory Moffitt, Jonathan Moreland and Robert Parsley to impede, obstruct and influence with falsehoods the SEC's investigation of the scheme to control and fraudulently manipulate the price of Nationwide common stock to artificially

14

high levels and thereby facilitate the sale of Nationwide shares that they owned, and to conceal from the SEC evidence of the scheme to control and fraudulently manipulate the price of Nationwide common stock so it could continue unfettered.

## MANNER AND MEANS OF THE CONSPIRACY

61.    Defendant MARC DUCHESNE and others known and unknown to the Grand Jury used the following manner and means, among others, to accomplish the objects and purpose of the conspiracy:

      a.      DUCHESNE, Moffitt and others made false statements to the SEC during investigative interviews in an effort to conceal the conspiracy to manipulate Nationwide's stock price so it could continue unfettered;

      b.      DUCHESNE, Moreland and others attempted to persuade YCO executives to change the financial numbers in YCO's business plan summary to match the false numbers contained in Nationwide's press release in an effort to conceal the conspiracy to manipulate Nationwide's stock price;

## OVERT ACTS

Within the District of Columbia and elsewhere, in furtherance of the above described conspiracy and in order to carry out the objects thereof, DUCHESNE and others known and unknown to the Grand Jury committed the following overt acts, among others:

62.    On or before August 29, 2002, DUCHESNE instructed Gregory Moffitt to tell the SEC that he did not know Moffitt's relative, C.P.

63.    On or about August 29, 2002, Moffitt falsely denied knowing C.P. when asked by the SEC during an investigative interview.

64.    On or about September 9, 2002, DUCHESNE falsely told the SEC over the telephone that he had never spoken to C.P.

15

65.    On or about September 9, 2002, DUCHESNE falsely told the SEC over the telephone that he had never spoken to Jeffrey Hayden about buying Nationwide common stock.

66.    On or about September 29, 2002, DUCHESNE instructed Jonathan Moreland to meet with two YCO executives.

67.    On or about September 29, 2002, DUCHESNE gave Moreland a copy of YCO's business plan on which he had indicated the financial numbers that needed to be changed to match the press release that Nationwide had issued regarding the purported merger with YCO.

68.    On or about September 29, 2002, Moreland traveled to YCO's offices.

69.    On or about September 29, 2002, Moreland worked with YCO executives to manipulate the company's financial numbers so that they matched the false financial numbers in the press release.

**(Conspiracy and Aiding and Abetting, Causing an Act to be Done,
in violation of Title 18, United States Code, Sections 371 and 2).**

**COUNT FOUR**
(Obstruction of Justice)

70.    The allegations contained in paragraphs 1 through 19, 56 through 58, and 62 through 69 of this Indictment are repeated and re-alleged as if fully set forth herein.

71.    On or before August 29, 2002, in the District of Columbia and elsewhere, the defendant, MARC DUCHESNE, did corruptly influence, obstruct, and impede, and endeavor to influence, obstruct, and impede, the due and proper administration of the Securities Exchange Act of 1934, 15 U.S.C. § 78, *et seq.*, and other statutes, rules, and regulations, under which a pending proceeding, *i.e.*, *In re Nationwide Capital Corp.* (File No. HO-9553), was being had before the SEC, an agency of the United States, by instructing and causing Gregory Moffitt to make false and

16

misleading statements to the SEC during an investigative interview that the SEC conducted of Moffitt by telephone from the District of Columbia, to wit, by instructing and causing Gregory Moffitt to lie to the SEC by stating that he did not know C.P.

**(Obstruction of Justice and Aiding and Abetting, Causing an Act to be Done, in violation of Title 18, United States Code, Sections 1505 and 2).**

## COUNT FIVE
(Obstruction of Justice)

72.    The allegations contained in paragraphs 1 through 19, 56 through 58, and 62 though 69 of this Indictment are repeated and re-alleged as if fully set forth herein.

73.    On or about September 9, 2002, in the District of Columbia and elsewhere, the defendant, MARC DUCHESNE, did corruptly influence, obstruct, and impede, and endeavor to influence, obstruct, and impede, the due and proper administration of the Securities Exchange Act of 1934, 15 U.S.C. § 78, *et seq.*, and other statutes, rules, and regulations, under which a pending proceeding, *i.e.*, *In re Nationwide Capital Corp.* (File No. HO-9553), was being had before the SEC, an agency of the United States, by making false and misleading statements to the SEC during an investigative interview that the SEC conducted of DUCHESNE by telephone from the District of Columbia, to wit, by falsely denying that he had ever spoken to C.P. and by falsely denying that he had ever discussed buying Nationwide common stock with Jeffrey Hayden.

**(Obstruction of Justice and Aiding and Abetting, Causing an Act to be Done, in violation of Title 18, United States Code, Sections 1505 and 2).**

## COUNT SIX
(False Statements)

74.    The allegations contained in paragraphs 1 through 19, 56 through 58, and 62 through 69 of this Indictment are repeated and re-alleged as if fully set forth herein.

17

75.    On or about October 7, 2002, DUCHESNE executed and filed with the SEC in the District of Columbia a Schedule 13D on which DUCHESNE certified that the information set forth in the Schedule 13D was true, complete and correct to the best of his knowledge and belief.

76.    On or about October 7, 2002, in the District of Columbia, having certified that he was providing true, complete and correct information, MARC DUCHESNE did willfully and contrary to his certification make declarations that were material to the SEC's investigation and that defendant DUCHESNE did not believe to be true and, in fact, well knew at the time were not true. To wit, DUCHESNE falsely reported in the Schedule 13D that on September 27, 2002, he became the beneficial owner of 8.38 percent of the outstanding shares of Nationwide common stock when in fact as early as August 9, 2002, DUCHESNE well knew that he was the beneficial owner of more than 20 percent of Nationwide's outstanding shares.

**(False Statements, in violation of Title 18, United States Code, Section 1001).**

A TRUE BILL



FOREPERSON.



ATTORNEY FOR THE UNITED STATES IN
AND FOR THE DISTRICT OF COLUMBIA

18